**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| SYLVIA CAMPOS, individually and on behalf of a class of similarly situated individuals, | ) | |
| *Plaintiff,* | ) | No. 1:23-cv-03843 |
| v. | ) | |
| | ) | Hon. John J. Tharp |
| TUBI, INC., a Delaware corporation. | ) | |
| *Defendant.* | ) | |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT TUBI, INC'S MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT UNDER RULE 12(b)(6)**

Dated: October 2, 2023

Eugene Y. Turin
Jordan R. Frysinger
McGuire Law, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
eturin@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiff and the Putative Class*

## TABLE OF CONTENTS


**Table of Authorities** ........ ii

**I. INTRODUCTION** ........ 1

**II. BACKGROUND** ........ 2

**A. Defendant's Collection and Disclosure of its Subscribers' PII** ........ 3

**B. Facts Specific to Plaintiff** ........ 5

**III. LEGAL STANDARD** ........ 6

**IV. ARGUMENT** ........ 8

**A. Defendant's Motion to Compel Arbitration Should be Denied** ........ 8

i. Defendant's Terms of Use link on its account-creation page is not a "clickwrap" agreement. ........ 8

ii. Defendant fails to establish that Plaintiff assented to its Terms of Use through its hybridwrap agreement when creating her Tubi account ........ 11

**B. Plaintiff's Allegations Are More Than Sufficient To Allege That Defendant Disclosed Its Subscribers' PII** ........ 14

**V. CONCLUSION** ........ 20

## TABLE OF AUTHORITIES

**Case** **Page(s)**

*Anand v. Heath*,
No. 19-cv-00016, 2019 WL 2716213 (N.D. Ill. 2019) ....................................8, 9, 10, 11, 13

*Applebaum v. Lyft, Inc.*,
263 F.Supp.3d 454 (S.D. NY 2017) ..........................................................................11

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Circuit 2017)..............................................................................15

*Gorny v. Wayfair Inc.,*
No. 18-cv-8259, 2019 WL 2409595 (N.D. Ill. 2019) ...............................................11

*Harris v. Public Broadcasting Service*,
No. 22-cv-2456, 2023 WL 2583118 (N.D. GA 2023) ..............................................19

*In re Hulu Priv. Litig.*,
No. 11-cv-03764, 201 WL 1724344 (N.D. Cal. 2014) .............................................17

*In re Vizio, Inc., Consumer Privacy Litigation*,
283 F.Supp.3d 1204 (C.D. Cal. 2017)...................................................... 15, 16, 19

*Jackson v. Fandom, Inc.*,
No. 22-cv-04423, 2023 WL 4670285 (N.D. Cal. 2023)............................................17

*Lebakken v. WebMD LLC*,
640 F.Supp.3d 1335 (N.D. Ga. 2022) ......................................................................17

*Louth v. NFL Enterprises LLC*,
No. 21-cv-00405, 2022 WL 130866 (D. R. I. 2022)........................................... 15, 16

*Miracle-Pond v. Shutterfly, Inc.,*
No. 19-cv-04722, 2020 WL 2513099 (N.D. Ill. 2020) .............................................10

*Morr-Fitz, Inc. v. Blagojevich,*
231 Ill. 2d 474 (2008)...............................................................................................19

*Myer v. Uber Technologies, Inc.*,
868 F.3d 66 (2nd Circuit 2017)................................................................................10

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ..............................................................................8, 13

*Sgouros v. TransUnion Corp.*,
No. 14-c-1850, 2015 WL 507584 (N.D. Ill. 2015) .......... 8

*Wilson v. Redbox Automated Retail, LLC*,
448 F.Supp.3d 873, 883 (N.D. Ill. 2020) .......... 8, 9, 10, 11, 13, 14

*Yershov v. Gannett Satellite Information Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) .......... 15, 16, 19

**Statutes**

18 U.S.C. § 2710 *et seq* .......... 1, 15

California Consumer Privacy Act, Cal. Civ. Code § 1798.100 *et seq* .......... 17

**Other Authorities**

S. Rep. No. 100-599 .......... 15

# I. INTRODUCTION

The Video Privacy Protection Act (the "VPPA"), 18 U.S.C. § 2710 *et seq.* was passed by Congress to protect consumers' privacy about the video materials that they rent or buy to watch. Although the VPPA was passed in 1988, with the rise of online and mobile device video streaming services such as Netflix and Amazon Prime Video, it is more relevant than ever as it serves to protect consumers from having their video watch history disclosed to advertisers and monetized, or, worse yet, utilized by nefarious groups or organizations that could pay such streaming services to identify vulnerable populations.

Defendant Tubi, Inc. ("Defendant" or "Tubi") is one of the largest video streaming services in the country, with over 64 *million* subscribers. Critically, Tubi, unlike traditional streaming services such as Netflix, does not have a paid subscription option and is solely ad-supported. As such, and as Plaintiff plainly alleges, Tubi necessarily collects and discloses its subscribers' identities and viewing history in order to target advertisements for various paying third-parties to specific individuals who will view them. Plaintiff Sylvia Campos ("Plaintiff") was one such subscriber who created an account and subscribed to Tubi's streaming service in order to view its video materials. As a result of Plaintiff viewing Tubi's video materials, Tubi knowingly and intentionally disclosed her personally identifiable information, including her viewing history, to third parties without her written consent. As such Defendant has violated Plaintiff's and the other class members' privacy rights under the VPPA.

Rather than challenge Plaintiff's claims on the merits, Defendant instead attempts to compel Plaintiff to arbitrate her claims. However, arbitration is a matter of contract, and Defendant fails to demonstrate that Plaintiff assented to the Terms of Use during her initial enrollment in 2021. Indeed, while Defendant attempts to argue that Plaintiff consented to arbitrate her claims

through a "clickwrap" agreement, the fact of the matter is that Defendant in actuality used a "hybridwrap" agreement that never adequately notified Plaintiff that she would become bound to the TOU when the only call-to-action she interacted with was a button to "Continue with Email." As this Court has found in an identical case, as well as other sister courts, such deceptively designed "hybridwrap" agreements are unenforceable.

Nor is there any merit to Defendant's argument that Plaintiff merely "echo[s] the language of the statute" in her Complaint as Plaintiff alleges specific facts based on Defendant's own disclosures and media statements that explain in detail how Tubi collected her personally identifiable information, including information that could be used to identify her as an individual who has requested to view a specific video(s), and disclosed it to third parties without her written consent. For these reasons, and those stated in further detail below, Defendant's Motion to Compel Arbitration or in the Alternative to Dismiss should be denied.

## II. BACKGROUND

Defendant Tubi operates one of the most popular online video streaming services in the nation, boasting 64 million monthly active users. (First Amended Complaint ("FAC" or "Complaint"), Dkt. 7, at ¶ 19.) Unlike other streaming platforms, Defendant's streaming platform is a completely ad-supported service, meaning that instead of paying a subscription fee to gain access to its content Defendant's subscribers are required to watch advertisements to view movies and shows. (*Id*. at ¶ 20.) As such, Defendant collected its subscribers' personally identifiable information ("PII") – information which identifies a Subscriber as having viewed specific video content – and disclosed it to third-parties in order to operate its service and target paid advertisements to specific individuals who would be most likely to be interested in the advertised product or service. (*Id.* at ¶ 23.) However, and most critically, Defendant never obtained its

subscribers' consent to disclose their PII with third parties as required under the VPPA. (FAC at ¶ 22.)

**A. Defendant's Collection and Disclosure of its Subscribers' PII.**

While Defendant attempts to dispute that it collected its subscribers PII, Plaintiff's Complaint plainly alleges numerous facts establishing that it does so based on disclosures made by Defendant itself. To begin with, in its privacy policy Defendant readily admits that it "may" collect a slew of information from its subscribers including but not limited to: 1) Registration information; 2) Information from Social Media; and 3) Activity Information which details how its subscribers use its services. (FAC at ¶ 24.) Importantly, the Activity Information that Tubi "may" collect specifically includes information about subscribers' computer, device, and browser, including subscribers' IP address, browser type, the unique device identifier assigned to the device they are using to access its streaming service, and geolocation data including a subscribers' precise location. (*Id*.) Furthermore, Defendant states that it uses cookies and other tracking technologies (such as browser cookies, pixel beacons, local storage, and other mechanisms) to collect such information including specifically "[i]nformation about [Subscribers'] usage of Tubi services, such as pages [Subscribers] have visited, search history, and the video and other content [Subscribers] have viewed." (*Id.*) Thus, the compilation of data that Defendant admits it "may" collect identifies specific subscribers, their exact location, and the specific video content that they viewed. (*Id.* at ¶ 25.)

Defendant also admits in its Privacy Policy that it may disclose the PII it collects with third-parties. Specifically, Defendant states that it may share PII with third parties to "deliver content [subscribers] will find relevant and interesting, including advertising and marketing messages" and to "provide [subscribers] with content and advertising that is more interesting and relevant to [the

subscriber][.]" (FAC at ¶ 26.) Defendant further admits that it can share "demographic information, inferred interests, aggregated information, and information about the different devices and/or browsers [subscribers] use and [subscribers'] activity on such devices and browsers" to assist third-parties "in delivering advertising that is more relevant to [subscribers] across marketing channels." (*Id.*) In addition, Defendant states that it may share the above-mentioned collected data, including PII, with third-party "Company Affiliates," and "business partners to permit them to send [subscribers] marketing communications consistent with [subscribers'] choices." (*Id.* at ¶ 27.) While Defendant's Privacy Policy is careful to only state that it *may* share the aforementioned collected PII from its subscribers with third-parties, Defendant's corporate website, other privacy policies, and advertiser pitch-decks make clear that Defendant does in fact do so. (*Id.* at ¶ 28.)

For example, Defendant's 2023 "Audience Insights" report discloses how one of the advertising campaigns that Defendant created involved Defendant identifying specific individuals that were shown a specific advertisement for an automotive company that they viewed while watching content on Tubi, and disclosing that information, including their contact information, to a survey provider to ask them about their experience viewing the advertisement on Tubi. (*Id.* at ¶ 29.) Indeed, Defendant touts that its technology allows advertisers to determine the "unique clusters" of content that its advertisements were viewed in, as well as details about the viewers such as age, gender, income, household size, and education. (*Id.* at ¶ 30.)

Third-party ad providers that connect advertisers with Tubi and utilize Tubi's ad-platform further confirm that Defendant discloses its subscribers' PII. Specifically, Tubi provides advertisers the ability to "reach[] people of different ages, familial statuses, and ethnicities . . . [and] makes its key audience takeaways available to brands to help you decide if your target audience falls into Tubi streamers." (*Id.* at ¶ 32.) Defendant has even partnered with TransUnion,

a leading credit-reporting agency with exacting details about millions of consumers throughout the country, to be able to connect its subscribers' viewing data with specific demographic data that can be used to identify them on an individual level. Defendant's partnership allows advertisers to "seamlessly bridge the gap between individual and household, and deliver a more personalized ad experience alongside the content." (FAC at ¶ 33.)

Finally, the nature of how Defendant's streaming service operates necessarily means that it discloses its subscribers' viewing data. Indeed, Defendant's streaming service is an "ad-supported video-on-demand" service which does not have a paid subscription and only operates based on requiring its subscribers to watch advertisements during the video content that they are streaming. (*Id.* at ¶¶ 4–5.) As such Defendant necessarily had to disclose its subscribers' viewing information and identities to the third-party advertisers that paid to have their ad content appear on specific viewer's video streams. (*Id.* at ¶ 43.) Indeed, the Mozilla Foundation's review of Defendant's Tubi service confirms that "Tubi matches third-party data to 'existing customers' to allow advertises to target specific individuals." (*Id.* at ¶ 34.)

In short, Defendant obtains a slew of data from its subscribers, including PII which can be used to identify a specific person, their device information, their exact location information, and the content and videos that they viewed, and shares it with a variety of third parties for profit. (*Id.* at ¶ 35.) By disclosing its subscribers' PII, which reveals both their identity and the video materials they have requested from Defendant, Defendant has intentionally and knowingly violated the VPPA.

**B. Facts Specific to Plaintiff.**

Plaintiff Sylvia Campos created an account and subscribed to Defendant's Tubi streaming service on or around November 16, 2021. (Elliot Declaration, Dkt. 13-1, ¶ 17.) When registering

for her account, Plaintiff was prompted to select one of three options to create her account, including a large red button to "Continue with Email." (MTD at 2.) Plaintiff chose the "Continue with Email" option and proceeded to create her account. (MTD at 2; Elliot Decl., at ¶¶ 6, 17.) At no point during her registration process was Plaintiff ever required to affirmatively assent to Defendant's Terms of Use, nor was she clearly and conspicuously notified that by merely registering for her account, that she would be bound to the Terms of Use given that the only disclosures Defendant provided as to its Terms of Use was a disclosure placed far away from the call-to-action Plaintiff interacted with and made in very small print and the same color as the black background. (Elliot Decl. at ¶ 5.)

After registering for her Tubi account, Plaintiff used her account to view video materials through her free Tubi subscription on a weekly basis. (FAC at ¶ 40.) Plaintiff never specifically and separately consented, agreed, authorized, or otherwise permitted Defendant via written consent to collect her PII and disclose it to third parties. (*Id.* at ¶ 44.) However, in order for Tubi's streaming service to operate for free and place targeted ads to Plaintiff and other subscribers, Defendant disclosed Plaintiff's PII, including specifically her viewing history, to third-parties. (*Id*. at ¶ 43.) By revealing both Plaintiff's identity and the content that she viewed to third parties, Defendant has violated Plaintiff's privacy rights under the VPPA. (*Id.* at ¶ 46.)

## III. LEGAL STANDARD

Whether an arbitration agreement is valid and should be applied is "a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit." *AT&T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 648 (1986); *see also Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 626 (1985). Courts should generally "apply ordinary state-law principles that govern the formation of

contracts" (*First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)) to determine whether the parties agreed to arbitration as the Federal Arbitration Act "places arbitration agreements on equal footing with other contracts[.]" *Rent-A-Ctr., W., Inc. v. Jackson,* 561 U.S. 63, 67 (2010). As the party seeking to compel arbitration, Defendant "bear[s] the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence[.]" *Mohammed v. Uber Techs., Inc.*, No. 16-cv-2537, 2018 WL 1184733, at *5 (N.D. Ill. Mar. 7, 2018). Thus, "a district court considering . . . an agreement to arbitrate should give to the party denying the agreement the benefit of all reasonable doubts and inferences that may arise." *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 Fed. Appx. 782, 785–86 (11th Cir. 2008).

Defendant alternatively challenges Plaintiff's VPPA claims pursuant to Fed. R. Civ. P. 12(b)(6). (MTD at 10.) A complaint should be dismissed under Rule 12(b)(6) only where it appears that the facts alleged fail to state a "plausible" claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint may survive a motion to dismiss for failure to state a claim, however, even if it is "improbable" that a plaintiff would be able to prove those facts or even if the possibility of recovery is extremely "remote and unlikely." *Bell Atl. Corp. v. Twombly*, 550 US. 544, 556 (2007). When considering a Rule 12(b)(6) motion, the court must construe the complaint "in the light most favorable to the nonmoving party, accept well-pleaded facts as true, and draw all inferences in [the plaintiff's] favor." *Kolbe & Kolbe Health & Welfare Benefit Plan v. Med. Coll. of Wis.*, 657 F.3d 496, 502 (7th Cir. 2011); *see also Sanjuan v. American Bd. Of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994). Under notice pleading, the plaintiff need only give the defendant a fair notice of the plaintiff's claim and the grounds upon which it rests. *See Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).

## IV. ARGUMENT

### A. Defendant's Motion to Compel Arbitration Should be Denied.

Defendant's Motion to Compel Arbitration should be denied because Defendant's account-creation page was not a conspicuous "clickwrap agreement" but rather a deceptively designed "hybridwrap" agreement that failed to have sufficient disclosures for Plaintiff to have assented to Defendant's Terms of Use.

i. Defendant's Terms of Use link on its account-creation page is not a "clickwrap" agreement.

As an initial matter, Defendant argues that its account-creation pages and Terms of Use formed a valid and enforceable "clickwrap agreement" when Plaintiff created her account. (MTD at 8.) Defendant's assertion is unsurprising given that clickwrap agreements – where a digital device user clicks a separate button or checkbox which accompanies a disclosure that by doing so they are assenting to a set of terms – are generally enforced. *See Sgouros v. TransUnion Corp.*, No. 14-c-1850, 2015 WL 507584, at *4 (N.D. Ill. Feb. 5, 2015). However, Defendant's assertion is meritless as its online agreement does not have any features of a clickwrap agreement.

Courts often group online agreements into one of two categories: "clickwrap" agreements, as detailed above, and "browsewrap" agreements, "where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Anand v. Heath*, No. 19-cv-00016, 2019 WL 2716213, at *3 (N.D. Ill. June 28, 2019) (Hon. John J. Tharp) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014)). However, "[m]any online contracts do not fit neatly into the clickwrap or browsewrap categories but instead share characteristics with both." *Wilson v. Redbox Automated Retail, LLC*, 448 F.Supp.3d 873, 883 (N.D. Ill. 2020) (citing *Anand*, 2019 WL 2716213, at *3). In *Redbox*, the court analyzed whether the agreements presented to customers via its website and kiosks were clickwrap or hybridwrap

agreements. In making its distinction between clickwrap and hybrid, the court stated that "[u]nlike with a clickwrap agreement, for which a customer must expressly agree to the terms and conditions, the affirmative assent in the hybrid agreements here serves an additional, more prominent purpose." *Redbox*, 448 F.Supp.3d at 883. By way of example the court explained that "Customers renting a movie from a Redbox kiosk hit 'Pay Now' to complete the rental. Customers using Redbox's website click 'Sign In' to access their Redbox account. Assent to the Terms of Use is coupled with both acts but it is not the primary purpose of either act." *Id*. Similarly, in *Anand*, this Court analyzed a configuration of an agreement which displayed a hyperlink to the defendant's terms and conditions above a "Continue" button. *Anand*, 2019 WL 2716213, at *1. This Court stated that the "configuration presents what can best be described as a hybridwrap agreement because the terms and conditions were hyperlinked rather than displayed to the user in full, and the user's ability to continue through the site was not conditioned on her express assent to the terms and conditions." *Anand*, 2019 WL 2716213, at *4.

Here, like in *Redbox* and *Anand*, Plaintiff was presented with a hybridwrap agreement when she created her account on Defendant's Tubi Android application. Plaintiff, like Defendant's other subscribers, clicked "Continue with Email" to create her account and allow her to access Defendant's streaming service. (Elliot Decl. at ¶¶ 5, 6, 17.) The Terms of Use that include the arbitration agreement Defendant is attempting to enforce were located at the very bottom of the page that Plaintiff was presented, in inconspicuous fine print that was almost the same color as the black background, and simply stated that "By registering, you agree to Tubi TV's Terms of Use and Privacy Policy." (Elliot Decl. at ¶ 5.) Thus, Plaintiff was essentially presented with a sign-up page that featured a hyperlink to Defendant's Terms of Use at the very bottom of the page and were completely disconnected from the "Continue with Email" button. Critically her "ability to

continue through the site was not conditioned on her express assent to the terms and conditions" (*Anand*, 2019 WL 2716213, at *4) and just like in *Redbox* her "affirmative assent" . . . served an additional, more prominent purpose"—to create an account with Defendant. 448 F.Supp.3d at 883. Accordingly, the online agreement Defendant is attempting to enforce is in fact a hybridwrap agreement.

Defendant's reliance on *Miracle-Pond v. Shutterfly, Inc.*, No. 19-cv-04722, 2020 WL 2513099 (N.D. Ill. May 15, 2020) in an attempt to convince this Court its online agreement constitutes a "clickwrap" agreement is unconvincing. In *Miracle-Pond* the court considered a page that included a button that said "Accept" below the statement "By tapping 'Accept', you agree to use the Shutterfly for Android software and the associated Shutterfly services in accordance with Shutterfly's Terms of Use." *Id.* at *1. The court determined that presenting the terms of use, and stating that clicking "Accept" would be considered acceptance of the terms of use, along with providing *both* an "Accept" and "Decline" button, formed a valid clickwrap agreement because "a reasonable user . . . would understand that she was manifesting assent to the terms." *Id.* (internal citation omitted). Here, unlike in *Miracle-Pond*, the relevant language about Defendant's Terms of Use was at the bottom of the page, did not in any way tie to the call-to-action button that Plaintiff interacted with, did not expressly inform Plaintiff that she was consenting to them by pressing "Continue with Email," nor did Defendant present an option to "decline." (Elliot Decl. at ¶ 5.)

Because Defendant is attempting to enforce a hybridwrap agreement, this Court must make a fact-based inquiry to determine whether "the existence of the terms was reasonably communicated to the user." *Redbox*, 448 F.Supp.3d at 884 (citing *Myer v. Uber Technologies, Inc.*, 868 F.3d 66, 76 (2nd Circuit 2017).

ii. Defendant fails to establish that Plaintiff assented to its Term of Use through its hybridwrap agreement when creating her Tubi account.

Courts typically "will give effect to hybridwrap terms where the button required to perform the action manifesting assent . . . is located directly next to a hyperlink to the terms and a notice informing the user that, by clicking the button, the user is agreeing to those terms." *Anand*, 2019 WL 2716213, at *4; *see also Redbox*, 448 F.Supp.3d 883 (quoting *Gorny v. Wayfair Inc.*, No. 18-cv-8259, 2019 WL 2409595, at *5 (N.D. Ill. June 7, 2019)) (this [c]ourt must consider "both the law and the facts to see if a reasonable person in the plaintiff's shoes would have realized that [s]he was assenting to a contract"). "The more hybridwrap design diverges from this basic layout – such as by placing the notice further away from the action button, cluttering the screen with potentially distracting content, or omitting the language explicitly saying that by performing action the user agrees to be bound by the terms – the less likely courts are to find that inquiry notice has been provided." *Anand*, 2019 WL 2716213, at *4; *see also Redbox*, 448 F.Supp.3d at 883 (quoting *Applebaum v. Lyft, Inc.*, 263 F.Supp.3d 454, 466 (S.D. NY 2017)) ("The presentation of the online agreement matters: Whether there was notice of the existence of additional contract terms presented on a webpage depends heavily on whether the design and content of that webpage rendered the existence of the terms reasonably conspicuous").

Defendant's hybridwrap agreement here is unenforceable for two reasons: 1) because nothing links the "Continue with Email" button that Plaintiff interacted with and actually clicked to the language "By registering, you agree to Tubi TV's Terms of Use and Privacy Policy"; and 2) the "Continue with Email" button is not spatially coupled with the inconspicuous disclosure statement and Terms of Use hyperlink that is almost the same color as the black background and placed at the bottom of the screen. As other courts have found, both of these considerations are sufficient to deem a hybridwrap agreement unenforceable.

Here, the presentation of Defendant's online agreement is as follows:




(Elliot Decl. at ¶ 5.) As the screenshot reveals, Defendant's so-called disclosure statement appears in fine print at the very bottom of the page far apart from (and not logically associated with) the call-to-action "Continue with Email" button that Plaintiff pressed. Indeed, Defendant's declaration has to take care to specifically point out the disclosure statement with an arrow and separately zoom in on it just to make it clear for the Court to read. (*Id.*) Even if Plaintiff was prudent enough to read past each of the account creation options beyond "Continue with Email" (which Plaintiff clicked), including "Continue with Google," "Continue with Facebook," and further past the unrelated "Have an account? Sign in" buttons, the language that Defendant is relying on to demonstrate assent to its Terms of Use is illegible as it is in the smallest font featured anywhere on the page and is almost the same dark color as the black background. The aforementioned

presentation, layout, and language of Defendant's online agreement is the exact opposite of the sort of clear and conspicuous notice needed to adequately put Plaintiff on fair notice of terms that would bind her to a contract.

Critically, there is *nothing* linking the call-to-action "Continue with Email" language to the "By registering, you agree to Tubi TV's Terms of Use and Privacy Policy" terms. As such, the main and "more prominent purpose" of the "Continue with Email" button was just that, for Plaintiff to continue signing up for Defendant's streaming service by providing her email and contact information. *Redbox*, 448 F.Supp.3d at 883. There was no express notice informing Plaintiff that by clicking "Continue with Email" that she would be agreeing to Tubi's Terms of Use. *See Anand*, 2019 WL 2716213, at *4. Also, Plaintiff was not presented with an "'I agree' box after being presented with a list of terms and conditions of use," neither was she "require[d] . . . to manifest assent to the terms and conditions expressly." *Nguyen*, 763 F.3d at 1175–76. While Defendant presented Plaintiff with a "Register" button on a completely different page, on that page Defendant also again does not associate clicking the "Register" button with express assent to Defendant's Terms of Use and again featured the same illegible font and color. (Elliot Decl. at ¶ 9) (disclosure statement stating "[w]e use this information to confirm that you're meeting the age requirements set out in our Terms of Use").

Courts, including this very Court, have rejected "hybridwrap" agreements with presentations similar to the one at issue here. In *Anand*, this Court determined that a hybridwrap agreement was unenforceable where despite their close proximity the "Continue" button was not expressly linked to the language "I understand and agree" that Defendant argued constituted assent to the terms of use. 2019 WL 2716213, at *4. In *Redbox*, the court similarly determined that a hybridwrap agreement on a Redbox kiosk was unenforceable because the "Pay Now" button was

not spatially coupled with the terms of use where numerous other buttons were placed between the two. *Redbox*, 448 F.Supp.3d at 883–84. Here, Defendant's hybridwrap agreement should similarly not be enforced because: 1) the "Continue with Email" button was not expressly linked to the language associated with assent with the Terms of Use; 2) the "Register" button was on a completely different page and also was not expressly linked to any language that demonstrated assent to the Terms of Use; 3) the "Continue with Email" button was not proximately located near Defendant's disclosure statement; and 4) Defendant's language informing Plaintiff that she was assenting to the terms of use appeared in inconspicuous and illegible fine print. For these reasons Plaintiff's interactions with Defendant's sign-up page was just that, her assent to create an account with Defendant to gain access to its streaming service—it was *not* assent to agree to Terms of Use that she was never presented and was never asked to agree to. As such Defendant's Motion to Compel Arbitration should be denied.

### B. Plaintiff's Allegations Are More Than Sufficient To Allege That Defendant Disclosed Its Subscribers' PII.

Defendant's sole challenge to Plaintiff's VPPA claim on the merits is that Plaintiff supposedly fails to sufficiently allege that it disclosed personally identifiable information ("PII") collected from its subscribers. (MTD at 11–16.) However, Defendant's argument ultimately cannot dismiss the numerous *factual* allegations based on Defendant's own disclosures that its solely ad-supported streaming service did exactly that in order to show video advertisements bought by its customers to targeted subscribers while they watched specifically chosen content. Given the stage of the proceedings, Plaintiff's allegations are more than sufficient to allege that Defendant violated the VPPA.

The VPPA provides that "the term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials . . .

from a video tape service provided" 18 U.S.C. § 2710(a)(3). Congress intentionally using the word "includes" "normally implies that the proffered definition falls short of capturing the whole meaning." *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 486 (First Circuit 2016). This reading is confirmed by the Senate Report stating that the definition in § 2710(a)(3) "uses the word 'includes' to establish a minimum, but not exclusive, definition of personally identifiable information." S. Rep. No. 100-599, at 12. Congress's approach to PII makes sense because there are "[m]any types of information other than a name [that] can easily identify a person." *Yershov*, 820 F.3d at 486. For example, "when a football referee announces a violation by 'No. 12 on the offense,' everyone with a game program knows the name of the player who was flagged." *Id*. Further, "modern technology may indeed alter – or may already have altered – what qualifies [as PII] under the statute." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 986 (9th Circuit 2017). For example, in *Yershov*, the First Circuit held that the transmission of viewing records along with GPS coordinates and a device's unique identification number constituted PII. 820 F.3d at 486 ("[g]iven how easy it is to locate GPS coordinate on a map, this disclosure would enable most people to identify what are likely the home and work addresses of the viewer"). Therefore, the complaint "adequately allege[d] that [defendant] disclosed information reasonably and foreseeably likely to reveal which USA Today videos [plaintiff] obtained." *Id*. Further, in *Louth v. NFL Enterprises LLC*, the court also examined the sufficiency of allegations regarding the disclosure of consumers' geolocation in a VPPA case. There the court stated that the defendant disclosed "geolocation [data which] can be considered precise" which is "reasonably and foreseeably likely to identify a user who watched videos. . ." No. 21-cv-00405, 2022 WL 130866 at *2 (D. R. I. Sept. 12, 2022). The court in *In re Vizio, Inc., Consumer Privacy Litigation* ("*Vizio*") also examined similar allegations and determined that MAC addresses – a unique identifying

number assigned to electronic devices that can access the internet – can identify a person when combined with IP addresses, zip codes, product model numbers, and other information. *Vizio*, 283 F.Supp.3d 1204, 1225 (C.D. Cal. 2017). Thus, the court determined that the plaintiffs had plausibly alleged that "Vizio's provision of . . . 'highly specific viewing behavior data on a massive scale with great accuracy' amounts to the disclosure of [PII]." *Id.* at 1226.

Here, Defendant's own privacy policy states that Defendant may collect and disclose the same information which was deemed sufficient to qualify as PII in *Yershov, Louth,* and *Vizio*. Specifically, Defendant's privacy policy states that Defendant may collect its subscribers: name, address, e-mail address, device information including IP address, unique device identifier, and geolocation data including subscribers' precise location. (FAC at ¶ 24.) The above-mentioned collected information, along with information about Plaintiff's usage of Defendant's streaming service such as the video content she viewed, may then be disclosed to various third parties. (*See Id.* at ¶¶ 26, 27, 28–35.) As other courts have found, such information is "reasonably and foreseeably likely to reveal which" videos Plaintiff obtained. *See Yershov*, 820 F.3d at 486.

In addition, Defendant discloses that it may collect activity information by using cookies and other tracking technologies including "pixels beacons." (*Id.* at ¶ 24.) The collected information includes information about a subscribers' use of Defendant's streaming service, such as pages the subscriber has visited, search history, and the "videos and other content [the Subscriber] has viewed." (*Id.*) Further, Plaintiff has alleged that this information, along with other identifying information, such as her name, email address, identifying device information, and location information are disclosed to various third parties. (*Id.* at ¶¶ 23, 24, 26, 27.) Courts have consistently held that alleging the use of tracking pixels which package and disclose information such as identifying information along with video viewing information is sufficient to state a claim under

the VPPA. *See Lebakken v. WebMD LLC*, 640 F.Supp.3d 1335, 1342 (N.D. Ga. 2022) (allegations that WebMD's Facebook Tracking Pixel records user activity, including Facebook ID and email address, transmits that data to Facebook, and employs the aggregated data to improve the targeting of its online content to website users sufficient to allege that WebMD disclosed PII); *Jackson v. Fandom, Inc.*, No. 22-cv-04423, 2023 WL 4670285, at *4 (N.D. Cal. Jul. 20, 2023) (allegations that the Facebook pixel logs which videos a user requested along with a Facebook profile ID sufficient to allege defendant's disclosure of PII under the VPPA); *In re Hulu Priv. Litig.*, No. 11-cv-03764, 201 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) (same).

Defendant attempts to refute Plaintiff's allegations stemming from its own public disclosures by stating that she merely parrots the statutory language of the VPPA and that nothing she alleges affirmatively states that Defendant has actually disclosed PII. (MTD at 11–12.) However, while Tubi states in its privacy policy and Motion to Dismiss that it only "may" collect and share personal information, its own privacy notice contradicts this assertion and confirms such violations when it affirmatively states that "We and our advertising partners ***use*** certain personal information to deliver online advertisements to you on your devices tailored to your interests. This may be considered 'Selling or Sharing' under California law and 'Targeted Advertising' under Virginia and other state privacy laws."[12] (emphasis added). Plaintiff's remaining allegations further support her contentions that Defendant actually does disclose its subscribers PII and go far beyond merely reciting the language of the statute.

---

[1] https://tubitv.com/privacy/your-privacy-choices (last accessed October 2, 2023).

[2] Under the California Consumer Privacy Act "'Personal Information' means information that identifies, relates to, describes, is reasonably capable of being associated with, or could reasonably be linked, directly or indirectly, with a particular consumer or household" and specifically excludes "consumer information that is daintified or aggregate consumer information". Cal. Civ. Code § 1798.140(o). Furthermore, "selling" is defined as "selling . . . a consumer's personal information by the business to another business or a third party[.]" Cal. Civ. Code 1798.140(t).

Specifically, Plaintiff describes that Defendant's streaming service is an ad-supported streaming service that uses the slew of information it collects about its subscribers to deliver targeted advertising. (FAC at ¶¶ 6, 26–27, 43.) Plaintiff also alleges that Defendant represents that it provides its third-party advertisers the ability to "reach[] people of different ages, familial statuses, and ethnicities . . . [and] makes its key audiences takeaways available to brands to help you decide if your target audience falls into Tubi streamers" and allows advertisers to "track clicks and impressions, whether [a Subscriber] watched it [the advertisement] with sounds, how much they watched, and if [the Subscriber] paused the ad"—actions that all require disclosure of *individuals'* identities and viewing history. (*Id.* at ¶ 32.) Further, Defendant's business partnership with TransUnion, one of the nation's leading providers of consumer reports with exacting details about millions of consumers throughout the country, is telling, as it enabled Defendant to connect its subscribers' viewing data with specific demographic data that can be used to identify them on an individual level. (*Id*. at ¶ 33.) Indeed, the report that Plaintiff cites in her Complaint states that "[t]his unique picture of the connected consumer is created by combining Tubi's deep understanding of content viewing behaviors with TransUnion's robust data assets, rooted in their cross-verified consumer database. As a result, advertisers can more seamlessly bridge the gab between ***<u>individual</u>*** and household, and deliver a more personalized ad experience alongside the content." (*Id.*) (emphasis added). According to the chief revenue officer of Defendant, integrating TransUnion data allowed Defendant to "improve the way advertisers reach and communicate with consumers" and "identify the best types of content and connect that to relevant messaging for viewers"—directly supporting Plaintiff's allegations that Defendant's ad-supporting streaming service operated by disclosing specific Subscriber's identities and their viewing history so that advertisers could target them. (*Id.* at ¶¶ 6, 33, 43.) Lastly, the Mozilla Foundation's independent

review of Defendant's streaming service further confirms that Defendant matches third-party data to "existing customers" to allow advertisers to target specific individuals. (FAC at ¶ 34.)

Considering the nature of Defendant's business as a solely ad-supported streaming service, its own disclosures regarding the personal and sensitive data it collects and discloses to third-parties, and the supporting articles and external evidence cited to by Plaintiff, Plaintiff's allegations that Defendant collects and discloses its subscribers' PII to third parties certainly cross the line of plausibility to allow her VPPA claims to survive at this stage of the litigation. While Plaintiff will ultimately have to support her allegations with facts obtained in discovery and prove that Defendant did in fact disclose its subscribers' PII, "this is a factual inquiry ill suited for resolution on a motion to dismiss." *Vizio*, 238 F.Supp.3d at 1225–26 ("The Court simply cannot accept [defendant]'s offer to engage in judicial fact-finding or make sweeping determinations as a matter of law on this Motion to Dismiss. Because [p]laintiffs have plausibly alleged that the array of information [defendant] discloses about them is personally identifiable information, the [c]ourt must deny [defendant]'s Motion to Dismiss [p]laintiffs' VPPA claims"); *Yershov*, 104 F.Supp.3d at 145 (observing that a "factual record would need to be developed before concluding that an Android ID is not PII"); *Harris v. Public Broadcasting Service*, No. 22-cv-2456, 2023 WL 2583118, at *5 (N.D. GA Mar. 20, 2023) ("If discovery reveals Defendant played no role in the transmission of Plaintiff's information to Facebook, the Court will consider that at summary judgement"). As such Defendant's Motion to Dismiss should be denied.[3]

[3] Should the Court grant Defendant's Motion in whole or in part, Plaintiff requests that any such dismissal be without prejudice to provide Plaintiff the opportunity to correct any curable defects, as it is well established that a cause of action should not be dismissed with prejudice unless it is clear that no set of facts can be proved under the pleadings which would entitle a plaintiff to relief. *Morr-Fitz, Inc. v. Blagojevich*, 231 Ill. 2d 474, 488 (2008).

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion to Compel Arbitration or, in the Alternative, to Dismiss Plaintiff's First Amended Complaint Under Rule 12(b)(6) should be denied in its entirety.

DATED: October 2, 2023

Respectfully submitted,

SYLVIA CAMPOS, individually and on behalf of similarly situated individuals

By: /s/ *Eugene Y. Turin*
One of Plaintiff's Attorneys

Eugene Y. Turin
Jordan R. Frysinger
McGuire Law, P.C.
55 W. Wacker Drive, 9th Floor
Chicago, IL 60601
Tel: (312) 893-7002
eturin@mcgpc.com
jfrysinger@mcgpc.com

*Attorneys for Plaintiff and the Putative Class*

## CERTIFICATE OF SERVICE

I hereby certify that on October 2, 2023, I electronically filed the foregoing *Plaintiff's Memorandum of Law In Opposition To Defendant's Motion To Compel Arbitration Or, In The Alternative, To Dismiss Plaintiff's First Amended Complaint Under Rule 12(b)(6)* with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record.

/s/ *Eugene Y. Turin*